In the

# United States Court of Appeals
## for the Seventh Circuit

No. 24-1125

CITY OF HAMMOND, INDIANA, et al.,

*Plaintiffs-Appellants*,

*v.*

LAKE COUNTY BOARD OF ELECTIONS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:21CV160-PPS — **Philip P. Simon**, *Judge*.

ARGUED SEPTEMBER 5, 2024 — DECIDED JULY 2, 2026

Before SYKES, ST. EVE, and LEE, *Circuit Judges*.

SYKES, *Circuit Judge*. Most state trial judges in Indiana are elected. But in three of Indiana's most populous counties—Lake, Marion, and St. Joseph—the governor appoints the judges who serve on the superior court, a trial-level court with jurisdiction much like the state circuit court. In these counties the governor fills superior-court vacancies by appointment from a list of nominees submitted by a nonpartisan commission tasked with recommending the most qualified candidates. The appointed judges then face periodic re-

tention elections in which the county's voters decide only whether to keep them in office; the ballot is not open to other candidates. This hybrid, merit-based method of selecting judges is known as the "Missouri Plan," named for the state that developed it.

The City of Hammond and three voters sued election agencies and officials claiming that Indiana's use of this method of judicial selection in Lake County violates § 2 of the Voting Rights Act, which prohibits the states from imposing any voting "standard, practice, or procedure" that abridges the right to vote "on account of race or color." 52 U.S.C. § 10301(a). The suit alleges that the Missouri Plan gives the county's minority voters "less opportunity" than "other members of the electorate" to elect trial judges "of their choice." *Id.* § 10301(b). For support the plaintiffs rely mostly on demographic data, noting that in Lake County racial minorities comprise over 40% of the voting-age population, while elsewhere in Indiana—where open superior-court elections are the norm—less than 20% of the voting-age population is nonwhite.

As the case came to us, the § 2 claim presented a doctrinal puzzle. The Supreme Court has never recognized one like it. Section 2 litigation usually concerns redistricting maps, *see, e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023), or rules governing the time, place, or manner of an election, *see* *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021). But this case challenges what the Missouri Plan *is*—appointment + retention election—not how any election is run. The claim also falls within crosscutting circuit precedent. We've held that § 2 doesn't require any public officer to be elected rather than appointed, *Quinn v. Illinois*, 887 F.3d 322, 323–24 (7th Cir. 2018), but we've also held that § 2 ap-

plies to Indiana's use of the Missouri Plan to select superior-court judges in Lake County, *Bradley v. Work*, 154 F.3d 704, 709 (7th Cir. 1998).

The district judge concluded that *Quinn* applies and forecloses this claim, so he entered summary judgment for the defendants. The plaintiffs appealed, arguing that *Quinn* is distinguishable or should be overruled.

The legal landscape has changed since the case was briefed and argued, making it unnecessary to address the conflict in circuit precedent. In *Louisiana v. Callais*, the Supreme Court held that § 2 of the Voting Rights Act "imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." 146 S. Ct. 1131, 1146 (2026). No such inference is possible here. Indiana adopted the Missouri Plan for use in Lake County after a 1972 study showed broad dissatisfaction with the functioning of the county's superior courts because of the pressures and distractions of partisan judicial elections. The circumstances of that decision do not support a strong inference that it was the product of intentional racial discrimination. We affirm the judgment.

## I. Background

"Indiana has one of the most complicated trial court systems in the United States … ." John G. Baker, *Now or Never: Reforming Indiana's Court System*, 41 IND. L. REV. 817, 817 (2008).[1] To start, the Indiana Constitution provides for a system of circuit courts, each with general jurisdiction over all

---

[1] Judge Baker is the former Chief Judge of the Indiana Court of Appeals. When he retired from full service in 2020, he was the state's longest-serving judge. *Judge John G. Baker*, IND. JUD. BRANCH, https://www.in.gov/courts/appeals/judges/john-baker/ (last visited July 2, 2026).

criminal and civil matters. IND. CONST. art. 7, § 8; IND. CODE § 33-28-1-2. The Indiana Constitution further specifies that the "Judge for each circuit shall be elected by the voters" who live within it. Art. 7, § 7. Today, Indiana is divided into 91 judicial circuits; except for the Seventh Judicial Circuit, which encompasses both Dearborn and Ohio Counties in the southeast corner of the state, each circuit corresponds to one of Indiana's 92 counties. *See generally* IND. CODE tit. 33, art. 33.

The Indiana Constitution also authorizes the state legislature to establish other courts as it sees fit. Art. 7, § 1. To accommodate Indiana's growing population, in 1871 the legislature created a system of superior courts—one for every county with at least 40,000 residents. 1871 Ind. Acts 48, 48–49; *see* John G. Baker, *The History of the Indiana Trial Court System and Attempts at Renovation*, 30 IND. L. REV. 233, 247 (1997). As originally designed, the jurisdiction of the circuit and superior courts largely overlapped (together with the now-defunct courts of common pleas). 1871 Ind. Acts at 49. Each county superior court consisted of three elected judges who served staggered four-year terms. *Id.* at 50.

Since then, Indiana's superior courts have grown in number and in size, but their structure has remained mostly the same. Some of Indiana's counties are still too small to warrant the creation of a separate superior court. *E.g.*, IND. CODE §§ 33-33-4 (Benton County), -13 (Crawford County). But in a few counties, there are several. *E.g.*, *id.* §§ -27.2 (Grant County Superior Court No. 2), -79.4 (Tippecanoe County Superior Courts No. 4, No. 5, and No. 6). In short, most—but not all—of Indiana's 92 counties have at least one superior court, and the number of judges on each court loosely correlates to the county's population. *E.g.*, *id.* §§ -49-6

(36 judges in Marion County); -71-5 (8 judges in St. Joseph County).

As they exist today, Indiana's superior courts resemble the circuit courts in both form and function; like the circuit courts, the superior courts possess "original and concurrent jurisdiction" over all civil and criminal cases. *Id.* §§ 33-29-1-1.5 (standard superior courts), -1.5-2 (nonstandard superior courts). So although the dockets of the circuit and superior courts vary in some respects, the difference in nomenclature is "primarily due to accidents of legislative history" and doesn't reflect a "true difference[] in the[ir] nature or purpose." *About the Judicial Branch*, IND. JUD. BRANCH, https://www.in.gov/courts/about (last visited July 2, 2026). Both are trial courts of "general jurisdiction." *State v. Monfort*, 723 N.E.2d 407, 414 (Ind. 2000).

Throughout most of Indiana, superior-court judges are still elected, though their terms are now six years instead of four. IND. CODE § 33-29-1-3(a). Not so, however, in Lake, Marion, and St. Joseph Counties.[2] In these highly populated counties, the governor appoints the superior-court judges from a small list of candidates vetted by a nonpartisan commission. *Id.* §§ 33-33-45-38 (Lake County), -49-13.4 (Marion County); -71-38 (St. Joseph County). The appointed judges thereafter face periodic retention elections in which the county's voters decide only whether to keep them in office. *Id.* §§ -45-42, -49-13.3, -71-43. As mentioned, this method of judicial selection is often called the "Missouri Plan": Missouri was the first state to adopt it in 1940. Sandra Day

---

[2] The City of Hammond is in Lake County, as is Gary. Marion County encompasses Indianapolis and its suburbs, while the City of South Bend anchors St. Joseph County.

O'Connor, *The Essentials and Expendables of the Missouri Plan*, 74 MO. L. REV. 479, 485–86 (2009).

Our focus here is Lake County, which sits in the northwest corner of the state on the southern shores of Lake Michigan. Lake County encompasses the cities of Gary and Hammond and has about 500,000 residents, making it one of Indiana's most populous counties.[3]

When a vacancy arises on the Lake County Superior Court, a local nominating commission screens applicants and recommends the five "most highly qualified" to the governor. IND. CODE § 33-33-45-35(1). Permissible considerations include the applicant's law-school record, public service, legal experience, judicial temperament, possible conflicts of interest, age, and personality traits. *Id.* § -35(2). The commission may not, however, consider a candidate's political affiliation. *Id.* § -35(4).

The nominating commission is itself nonpartisan. It has seven members: three appointed by the governor; three appointed by the Lake County Board of Commissioners; and the Chief Justice of the Indiana Supreme Court, who serves ex officio as the chairperson but votes only when necessary to resolve a tie. *Id.* § -28(a), (b). At least two members must be nonlawyers who have "never been licensed to practice law," one must be a woman, and one "must be an individual from a minority group." *Id.* No member may hold "any other elected public office" or "office in a political party or organization." *Id.* § -28(c).

---

[3] *Lake County, Indiana*, U.S. CENSUS BUREAU, https://data.census.gov/profile/Lake_County,_Indiana?g=050XX00US18089 (last visited July 2, 2026).

Once the commission submits its list of the five most qualified candidates, the governor fills the vacancy by appointing a nominee from the commission's list. § -38(a). The governor must consider the same merit-based criteria as the nominating commission and likewise must disregard the nominees' political affiliation. *Id*. § -38(b). Newly appointed judges serve an initial term of two years and then face a countywide retention election; if retained, the judges are subject to retention elections every six years. *Id.* §§ -41, -42.

As noted, superior-court judges in Lake County have not always been selected this way; previously they were elected in partisan countywide elections. *See* 1895 Ind. Acts 210, 210–11. In 1971 the state legislature directed the Indiana Judicial Study Commission to evaluate the administration of Lake County's courts—and more particularly, the selection and tenure of its judges. 1971 Ind. Acts 2272, 2272–73.

The Judicial Study Commission retained the Institute for Court Management, a national nonprofit, which conducted an extensive study of Lake County's trial courts. Its findings were striking. Despite conducting "some 25 in-depth studies of courts throughout the country," the Institute had never found "such pervasive dissatisfaction with the functioning of the courts" as it had in Lake County.[4] It identified significant backlogs of civil and criminal cases and unequal workloads between the judges. The political pressures of the electoral process contributed to these problems: The system of partisan judicial elections, the Institute concluded, had "not

---

[4] INST. FOR CT. MGMT., A PROGRAM FOR THE IMPROVED ADMINISTRATION OF JUSTICE IN LAKE COUNTY (INDIANA) 2 (Oct. 1972) (on file with the Nat'l Ctr. for State Cts.), https://cdm16501.contentdm.oclc.org/digital/collection/ctadmin/id/947/.

always resulted in a top-quality judiciary" because the judges spent significant time campaigning and prioritized their "individual operations" over the effective administration of justice as a whole.[5] Among many other reforms, the Institute recommended shifting to a merit-based appointment method for selecting Lake County's superior-court judges.

The state legislature accepted the Institute's recommendation and in 1973 enacted a version of the Missouri Plan for use in Lake County's superior court. 1973 Ind. Acts 1651, 1658–70. Some details of that system, such as the composition of the nominating commission and the number of candidates it advances when a vacancy arises, have changed over time. But in all relevant respects, the merit-based Missouri Plan for appointing Lake County's superior-court judges—as we've summarized it above—is the same today as when it was adopted by the state legislature in the 1973 reform initiative.

In 2021 the City of Hammond and three voters, including Hammond's mayor Thomas McDermott and Indiana State Senator Lonnie Randolph, filed this lawsuit challenging Indiana's use of the merit-selection system for Lake County's superior-court judges. They raised claims under § 2 of the Voting Rights Act and the Indiana Constitution. (The state constitutional claim has no bearing here, so we'll say no more about it.) The suit named the Indiana Secretary of State, the Lake County Board of Elections, and the Lake County Judicial Nominating Commission as defendants.

The State of Indiana quickly sought to intervene to defend the challenged state statutes. That motion was granted,

---

[5] *Id.* at 2–6.

and the parties later agreed to dismiss the Nominating Commission from the suit.

The plaintiffs insist that their § 2 claim challenges only the retention-election feature of the Missouri Plan. That position makes little sense. The appointment and retention-election components of the Missouri Plan function together and can't be decoupled. The plaintiffs seek an injunction requiring Indiana to discard retention elections and implement open, contested elections for Lake County's superior-court judges. They seek, in other words, to judicially repeal the Missouri Plan and return to an elected judiciary in Lake County's superior courts. That's an attack on the county's judicial-selection system as a whole. We therefore construe this suit as a § 2 challenge to the use of the Missouri Plan in Lake County.

To support their claim, the plaintiffs rely almost entirely on a comparison of the racial demographics in Lake, Marion, and St. Joseph Counties and in the rest of the state. In Lake and Marion Counties, racial minorities comprise over 40% of the voting-age population; the same is true of about 25% of the voting-age population in St. Joseph County. In the rest of Indiana, less than 20% of the voting-age population is nonwhite. Parsing the demographic data somewhat differently, almost two-thirds of Indiana's black voters live in Lake, Marion, or St. Joseph Counties. In effect, then, most black voters in Indiana cast only up-or-down retention ballots for their county's appointed superior-court judges. Most of Indiana's white voters, by contrast, select their superior-court judges through open, contested elections. This discrepancy, the plaintiffs claim, violates § 2 because it gives black citizens in Indiana "less opportunity" than white citi-

zens to select the superior-court judges "of their choice." § 10301(b).

In addition to the demographic data we've just mentioned, the plaintiffs submitted an affidavit from Jerold Bonnet, general counsel in the office of the Indiana Secretary of State. Bonnet traced the history of judicial selection in Lake County and attested that a merit-based approach like the Missouri Plan "is essential in a highly populated and highly diverse jurisdiction like Lake County to provide safeguards for limiting political influence in Lake County superior courts." The plaintiffs maintain that Bonnet's use of the word "diverse" is evidence that Indiana's enactment of the Missouri Plan for Lake County was racially motivated.

Ruling on cross-motions for summary judgment, the district judge rejected the plaintiffs' § 2 claim, holding that our decision in *Quinn* foreclosed it. *Quinn* raised an analogous § 2 claim challenging the selection method for members of the Chicago Board of Education. 887 F.3d at 323. Under Illinois law, the Chicago mayor appoints the members of the city's school board, while school boards in other parts of the state are elected. *Id.* at 324. The plaintiffs in *Quinn* argued that the state legislature's choice of an appointment system for Chicago's school board had "a disproportionate effect on minority voters" in violation of § 2. *Id.* at 323. We rejected the claim, explaining that "§ 2 governs the conduct of elections[;] it does not guarantee that any given public office be filled by election rather than appointment, a civil-service system, or some other means." *Id.*

The judge found *Quinn* controlling, though he questioned whether the Supreme Court's intervening decision in *Brnovich* had undermined it. He also took note of contrary circuit precedent—namely, our decision in *Bradley*, which

(like this case) considered a § 2 challenge to the appointment plus retention-election system for selecting superior-court judges in Lake County. 154 F.3d at 706. The claim in *Bradley* was mooted by changes in the relevant state statutes while the litigation was underway. *Id*. at 710. Still, our opinion in *Bradley* had a lot to say about the merits of the plaintiffs' claim: we said that § 2 applies to Lake County's retention elections, and we analyzed the claim under the framework of the Supreme Court's vote-dilution precedents. *Id.* at 709–11.

The judge noted all this but ultimately found *Bradley* unhelpful. He considered himself bound by *Quinn* and entered judgment for the defendants.

## II. Discussion

In relevant part, § 2(a) of the Voting Rights Act of 1965 prohibits the states from imposing a voting "standard, practice, or procedure" in a manner that denies or abridges "the right of any citizen of the United States to vote on account of race or color." § 10301(a). Section 2(b) elaborates:

> A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

§ 10301(b).

As this case was briefed and argued, the dispute centered on the applicability and continued force of our decision in *Quinn*. The plaintiffs maintained that *Quinn* is distinguishable or should be reconsidered in light of the Supreme Court's decision in *Brnovich*, which articulated a multifactor test for evaluating challenges to rules governing the time, place, or manner of elections. The Court provided a nonexclusive list of factors that inform the question whether such a rule violates § 2's "equal openness" requirement. *Brnovich*, 594 U.S. at 668–72. Relevant factors include "the size of the burden imposed by a challenged voting rule," "the degree to which [the] rule departs from what was standard practice when § 2 was amended in 1982," the "size of any disparities in [the] rule's impact on members of different racial or ethnic groups," "the opportunities provided by a State's entire system of voting," and "the strength of the state interests." *Id.*

The plaintiffs' reliance on *Brnovich* is understandable. But the *Brnovich* factors do not easily map onto this claim. All § 2 claims require an examination of "the totality of circumstances," § 10301(b), and *Brnovich* makes clear that the relevant circumstances necessarily depend on the nature of the claim, 594 U.S. at 672–73. For example, the factors articulated long ago in *Thornburg v. Gingles*, 478 U.S. 30 (1986), "grew out of and were designed for use in vote-dilution cases"— that is, cases challenging redistricting plans. *Brnvovich*, 594 U.S. at 672. The Court emphasized in *Brnvovich* that some of the *Gingles* factors "are plainly inapplicable" in cases that present other kinds of § 2 challenges. *Id.* The same is true with respect to the *Brnovich* factors, which are tailored to § 2 cases challenging rules governing the time, place, or manner of elections.

This case is different. The plaintiffs do not challenge a time, place, or manner election rule. Their claim sounds in substance, not procedure. The plaintiffs take aim at Indiana's substantive decision in 1973 to shift to a merit-based appointment system for superior-court judges, coupled with a retention-only ballot-box component. The *Brnovich* factors are not well-adapted to resolving a claim of this type. (Needless to say, the *Gingles* factors are even further afield.)

An additional complication is the problem of determining the relevant electorate for § 2 comparison purposes. The statute's "equal openness" standard requires comparing minority voters' opportunity to elect candidates of their choice against that of "other members of the electorate." § 10301(b). That, in turn, requires choosing the correct comparator. Indiana's superior-court judges are trial judges who sit in and serve at the county level. Though they are state judges of general jurisdiction, the Indiana Code separates and organizes the superior courts by county and establishes each county's superior court as a distinct judicial entity. *E.g.*, IND. CODE §§ 33-33-45-3, -4 (establishing "a superior court in Lake County" that "shall be known as the superior court of Lake County"). And superior-court judges are chosen on a county-by-county basis according to the method provided by statute. The defendants accordingly argue that the relevant electorate for comparison purposes is the Lake County electorate.

If they're right, then the plaintiffs' § 2 claim fails at the starting gate because all Lake County voters have the same indirect say when it comes to selecting superior-court judges. *Quinn* made precisely this point: "Black and Latino citizens do not vote for the school board in Chicago, but neither

does anyone else. Every member of the electorate is treated identically, which is what § 2 requires." 887 F.3d at 325.

The plaintiffs, of course, frame the § 2 comparison differently. They argue that because superior-court judges have statewide jurisdiction, the voting opportunity of minorities in Lake County should be measured against that of nonminority voters across the entire state. They also argue that because the Missouri Plan was adopted by the state legislature, the state electorate as a whole must be the relevant comparator for their § 2 claim.

Complicating matters further is the tension between *Quinn* and *Bradley*. We've already identified this concern.[6]

These thorny questions occupied much of the parties' briefing and oral argument. But we need not resolve them. After we heard oral argument, the Supreme Court noted probable appellate jurisdiction in *Louisiana v. Callais*, 145 S. Ct. 434 (mem) (2024), and has recently issued its decision. The Court held that § 2 imposes liability "only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Callais*, 146 S. Ct. at 1156. Evidence of disparate impact is not sufficient. The Court's new understanding of § 2 resolves this case: There is no evidence that Indiana's decision to implement the Missouri Plan in Lake County was the product of intentional racial discrimination.

As discussed, the Indiana legislature adopted the hybrid, merit-based judicial-selection system in Lake County within

---

[6] We add that *Bradley* is perplexing for a separate reason. As we've noted, the § 2 claim in *Bradley* was moot because of intervening changes in state law, yet our opinion contains an extensive discussion of the merits of the claim. For this reason, the precedential effect of *Bradley*'s merits analysis is unclear.

months of receiving a study report from the Institute for Court Management recommending that it do so. And the reasons for that recommendation had nothing to do with race. Rather, the Institute found "pervasive dissatisfaction" with the functioning of Lake County's trial courts—the worst it had ever seen. That dissatisfaction, the Institute explained, was due in large part to the pressures and distractions of partisan judicial elections. The Indiana legislature accepted the Institute's recommendation to replace Lake County's judicial elections with a merit-based appointment system akin to the Missouri Plan. There's no evidence that its decision was motivated by the number or percentage of minority voters in Lake County or had anything at all to do with race.

To the extent the plaintiffs rely on the Bonnet affidavit to show that the legislature's decision was racially motivated, it does no such thing. Recall that Bonnet is general counsel to the Indiana Secretary of State; in his affidavit he recounted the history of judicial selection in Lake County and offered his view that a merit-based system like the Missouri Plan "is essential in a highly populated and highly diverse jurisdiction like Lake County to provide safeguards for limiting political influence in Lake County superior courts." As the plaintiffs see it, his use of the phrase "highly diverse" confirms that the adoption of the Missouri Plan in Lake County was racially motivated.

Not so. For starters, the Indiana legislature revised Lake County's judicial-selection system in 1973; Bonnet didn't join the Indiana Secretary of State's Office until 2005. His perspective thus sheds little light on whether the state legislature's decision was motivated by race. *Callais*, 146 S. Ct. at 1156.

Bonnet's comment, moreover, is hardly an admission of forbidden racial motivations. Eliminating partisanship in state courts is obviously a legitimate goal—one that is fully compatible with § 2 of the Voting Rights Act. It may be, as Bonnet thinks, that a "highly populated and highly diverse jurisdiction" like Lake County is particularly susceptible to such partisanship. But his current views on that subject do not support an inference—much less a strong one—that the state legislature's 1973 enactment of the Missouri Plan for use in Lake County's superior court was the product of racial discrimination.

In sum, this claim fails under *Callais*. The circumstances surrounding the Indiana legislature's decision to implement the Missouri Plan in Lake County do not "give rise to a strong inference that intentional discrimination occurred." *Id.* Without such an inference, § 2 "cannot impose liability." *Id.* at 1157.

AFFIRMED